IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PLATINUM SUPPLEMENTAL INSURANCE, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 17-cv-8872 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| GUARANTEE TRUST LIFE INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff's motion for attorney's fees [95]. For the reasons set forth below, the motion is granted in part and denied in part. Plaintiff is awarded $108,445.10 in attorney's fees to be paid by Defendant.

**I.     Background**

The Court presumes knowledge of its previous opinion granting summary judgment in favor of Plaintiff. See generally *Platinum Supplemental Insurance, Inc. v. Guarantee Trust Life Insurance Company*, 2019 WL 6210940 (N.D. Ill. Nov. 21, 2019); [93]. In brief, Plaintiff Platinum Supplemental Insurance ("Plaintiff") marketed and sold insurance policies underwritten by Defendant Guaranteed Trust Life Insurance ("Defendant"). Their business relationship was governed by a Marketing Agreement. By May 2015 the relationship had soured, Defendant wanted out of the Marketing Agreement, and the parties quickly settled some of their outstanding disputes in their First Settlement in July 2015. In December 2015, Defendant sued Plaintiff in Cook County Circuit Court alleging, inter alia, that Platinum breached the Marketing Agreement by failing to

adequately train and supervise its agents. Defendant sought more than $200,000,000 in damages in the breach of contract action.

After several months of procedural jockeying, the parties settled the Cook County action with a Second Agreement, executed in February 2017. The Second Agreement included a forum selection clause for the Northern District of Illinois, and the Cook County Circuit Court dismissed the underlying lawsuit. Meanwhile, in December 2016, someone who had purchased one of Defendant's policies from one of Plaintiff's salespeople sued Defendant in Missouri (the "Missouri Action"). Defendant filed a third-party complaint against Plaintiff, arguing that this all stemmed from Plaintiff's breach of the original Marketing Agreement. Plaintiff filed the present declaratory judgment action, arguing that the Second Agreement precluded any indemnification responsibility in the Missouri Action. The indemnification component of the Missouri Action was transferred to the Northern District of Illinois and consolidated with the present case. [31.]

Plaintiff ultimately moved for summary judgment [68], which the Court granted [92]; [93]. Now, Plaintiff seeks its attorney's fees pursuant to the Second Agreement [95].

II.     Analysis

In Illinois, "[t]he general rule is that the unsuccessful party in a lawsuit is not responsible for the other party's attorney fees." *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 515 (2d Dist. 2001) (citation omitted). A contract may, however, include a fee-shifting provision, but any such provision "should be strictly construed and enforced at the discretion of the trial court." *Id.* "By 'strictly construing' the contract, the Court must 'construe[ ] it to mean nothing more— but also nothing less—than the letter of the text.'" *Bank of America, N.A. v. Oberman, Tivoli & Pickert, Inc.*, 12 F. Supp. 3d 1092, 1100 (N.D. Ill. 2014) (quoting *Erlenbush v. Largent*, 353 Ill. App. 3d 949, 952 (4th Dist. 2004)).

In other words, in accordance with general principles of Illinois contract law, if a contract's language is facially unambiguous, its words "must be given their plain, ordinary, and popular meaning." *Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141, 154 (2004). All portions of a contract should be "construed as a whole, viewing each part in light of the others." *Gallagher v. Lenart*, 226 Ill.2d 208, 233 (2007) (citation omitted). In so construing a contract, a court should "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014). The party requesting fees bears the burden of demonstrating they are entitled to them. See *Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 488 (3d Dist. 1999); *cf., e.g., Dominguez v. Quigley's Irish Pub*, 897 F.Supp.2d 674, 683 (N.D. Ill. 2012) (citing *Small v. Richard Wolf Medical Instruments Corp.*, 264 F.3d 702, 707 (7th Cir. 2001)).

The parties agree that the contract provides that "the prevailing Party in any lawsuit brought to enforce this agreement shall be awarded its reasonable costs and attorney's fees, but such an award must be reasonably proportionate to the ultimate relief secured by the prevailing Party." [90, ¶ 13.] As the prevailing party, Plaintiff seeks more than $210,000 in legal fees. Defendant, disputes that these fees are either reasonable or proportionate to the ultimate relief secured.

Preliminarily, Illinois courts sometimes consider these questions in tandem—that is, where a contract allows for reasonable fee-shifting, a court may properly consider whether the fees were proportional as an adjunct to a multi-factor reasonableness test. See, *e.g., Crystal Lake Limited Partnership v. Baird & Warner Residential Sales, Inc.*, 138 N.E.3d 75, 92 (Ill. App. Ct. 2018). The Court, however, cannot do so here, because that would render the contractual provision requiring

proportionality superfluous. See *Land of Lincoln Goodwill*, 762 F.3d at 679. Thus, to give full effect to all of the contract language regarding fee shifting, the Court examines reasonableness and proportionality separately.

### A. The fees are reasonable

"To determine a reasonable fee award, a court must consider (1) the skill and standing of the attorney employed, (2) the nature of the cause, (3) the novelty and difficulty of the questions, (4) the amount and importance of the subject matter, (5) the degree of responsibility in the management of the case, (6) the time and labor required, (7) the usual and customary charges in the community, and (8) the benefits resulting to the client." *Powers*, 326 Ill. App. 3d at 515 (citing *Collins v. Hurst*, 316 Ill. App. 3d 171, 173, (2000)).[1]

Preliminarily, fees are reasonable if a "fee-paying client" would have paid them. *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 552 (7th Cir. 1999); see also *Fogle v. Williams Chevron/Geo, Inc.*, 275 F.3d 613, 615 (7th Cir. 2001) ("When computing a lawyer's fee under a fee-shifting statute, the judge's objective is to approximate the fee the lawyer would have obtained in the market for legal services.").[2] That said, a fee-paying client's actual expenditures may be

---

[1] Federal courts typically use "a 'lodestar' analysis, which multiplies the attorneys' reasonable hourly rates by the number of hours reasonably expended" as "the starting point" of fee calculations. See *Herrera v. Grand Sports Arena, LLC*, 2018 WL 6511155, at *2 (N.D. Ill. Dec. 11, 2018) (quoting *A. Bauer Mechanical, Inc. v. Joint Arbitration Bd. of Plumbing Contractors' Ass'n and Chicago Journeymen Plumbers' Local Union 130*, U.A., 562 F.3d 784, 793 (7th Cir. 2009)). Because Illinois courts tend to use the multifactor test, these fees are mandated by state contract law, and Defendant framed its objections in terms of the multifactor test, the Court will use that as its primary guidepost. That said, the same results would obtain under thorough lodestar analysis. The attorneys in question charged their market rates, which are presumptively reasonable, and devoted their time to legal, as opposed to administrative, tasks.

[2] Defendant's citation to *Fogle* for the proposition that fee-shifting movants must propound detailed information about market rates and each attorney's qualifications misses the mark. *Fogle* does say that a conclusory, self-serving affidavit is insufficient to justify a fee award—but it prefaces that analysis with the observation that an attorney's actual billing practices are the best evidence of the reasonableness of any fees. *Fogle*, 275 F.3d at 615–16. The reason *Fogle* could not rely on actual billing practices was because the attorneys in that action worked on a contingency basis. *Id.*

unreasonable, particularly if its attorneys never submitted detailed billing statements to begin with. See *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 984–85 (1st Dist. 1987) (requiring prevailing party's attorney to "specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor" and holding that the prevailing party failed to meet its burden when it did not include that information).

Here, Plaintiff provided detailed time sheets and thus cleared the threshold issue of specifying who did what and at what cost. See generally [95-1]; [95-3]; [95-5]; see also *Kaiser*, 164 Ill. App. 3d at 984. Plaintiff has also submitted affidavits that all of the attorneys' rates are what they customarily charge. See generally [95-2]; [95-4]; [95-6]. Because Plaintiff was a fee-paying client who paid the respective attorneys' market rates, these fees were presumptively reasonable. *Catalan v. RBC Mort. Co.*, 2009 WL 2986122, at *6 ("Counsel's actual billing rate for comparable work is presumptively appropriate for use as the market rate.") (citation and quotation marks omitted); *Spegon*, 175 F.3d at 552 (fees are reasonable if a "fee-paying client" would have paid them). Indeed, the Court knows exactly what "fee [Plaintiff's counsel] would have obtained in the market for legal services," because they have already charged (and been paid by) their clients. See *Fogle*, 275 F.3d at 615.

The *Powers* factors also indicate that the fee request is reasonable. Plaintiff's attorneys' rates are proxies for their skills and experience and customary charges in the community, and, in any event, counsel's skill showed throughout its management of the present action. Indeed, Plaintiff's counsel brought many benefits to bear for their client, including obtaining all of the relief sought. Plaintiff was also not entirely in control of case management (and thus counsel's hours), as the instant litigation began in the Missouri Action (which Plaintiff moved to transfer to this District), defend against a motion to dismiss, and engage in discovery. See [15]; [21]; [54].

Defendant focuses its arguments on the second, third, fourth, and sixth *Powers* factors, arguing that the fees sought were nonetheless unreasonable because (a) this lawsuit was low-stakes and therefore did not require such high billers to focus on the litigation, and (b) Plaintiff's counsel inadequately supported the number of hours worked (and/or billed excessively). Defendant contends that it was unreasonable to have such experienced (*i.e.*, expensive) counsel handle the matter, because this was not an especially complex case, there were no novel issues, and the amount in controversy was relatively low. As explained above, however, Plaintiff's expenditures are presumptively reasonable given that it actually paid the fees and the billing statements are sufficiently detailed. *Spegon*, 175 F.3d at 552; *Fogle*, 275 F.3d at 615. Moreover, the context of this litigation demonstrates why these fees were reasonable. The present action is but a skirmish in a "long-standing and multi-faceted dispute," during which the parties entered a settlement agreement in 2015; litigated over hundreds of millions of dollars; litigated the arbitrability of the first settlement; and then entered into a broader settlement. *Platinum*, 2019 WL 6210940, at *2–3. It is hardly surprising that Plaintiff relied heavily on experienced counsel with deeper ties to this ongoing dispute, as the *overall* stakes of any dispute arguably stemming from the Second Agreement could be quite high, and any contract interpretation argument would have to accommodate Plaintiff's longer-term litigation strategy.

Defendant's arguments that the hours are insufficiently documented and excessive also miss the mark. While it is true that "clumped" billing (aggregating the hours it took to complete multiple tasks into a single entry) is discouraged, fees should only be reduced where the Court cannot determine whether the bills are reasonable. Compare, *e.g.*, *Messana v. Mercedes Benz of North America, Inc.*, 2000 WL 988163, at *2 (N.D. Ill. July 18, 2000) (reducing each clumped entry by 0.25 hours because the court suspected that counsel clumped billable legal work along

6

with administrative tasks), with *Amer. Sec. Mortg. v. Mercedes Benz of North America, Inc.*, 1998 WL 70609, at *3 (N.D. Ill. February 11, 1998) (declining to strike or reduced clumped entries because the totals were reasonable). Here, unlike in *Messana*, there is no indication that the attorneys in question clumped non-billable work along with their legal work. For example, Defendant objects to one of the attorneys clumping together 2.25 hours spent "revis[ing] motion for summary judgment" with "prepar[ing] affirmation in support of summary judgment." [104 at 12.] Obviously, the two go in tandem, and 2.25 hours is not unreasonable to spend on both or bill to a client. The Court will not penalize Plaintiff's counsel for providing further detail as to what went into revising the motion for summary judgment.[3]

Next, Defendant argues that having multiple partners staff this case was unnecessarily duplicative, and that they billed too many hours to boot. It is true that frequently having too many cooks spoils the broth, especially when it comes to a straightforward contract interpretation issue, as here. The problem for Defendant, though, is that this breach of contract action is part of a much longer and more complex dispute. Requiring multiple partners' input makes more sense in this context, where the outcome of this smaller piece of the puzzle could have broader ramifications. It was reasonable to consult with multiple partners on these deceptively complex issues and iteratively incorporate their respective edits and comments.[4] Likewise, many hours were spent disputing Defendant's own motions, including, for example, its motion to dismiss.

---

[3] Although the Court has an independent obligation to ensure all requested fees are reasonable, *Spellan v. Bd. of Educ. for Dist. 111*, 59 F.3d 642, 646 (7th Cir. 1995), it is not "obligated to conduct a line-by-line review of the bills to assess the charges for reasonableness." *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 738 (7th Cir. 2010). In any event, the Court reduces the requested fees as disproportionate, so even moderate adjustments to the hours worked or market rate would not impact the ultimate fee award.

[4] Defendant also objects to Plaintiff's utilization of multiple law firms to staff this case, but Defendant has not directed the Court to any case where the retention of multiple firms was deemed to be duplicative. The Court notes, moreover, that two of the firms utilized attorneys with much lower hourly rates, suggesting that this multiple firm strategy *lowered* costs.

B.   **The fees are disproportionate**

Defendant's primary argument is that the requested fees are disproportionate because they are three times more than the damages in the underlying contract action. Plaintiff counters that the "relief" secured was greater than the damages at issue in the instant action, as Plaintiff's win provided further clarity regarding the settlement(s).

Unlike most of the Illinois cases to address proportionality in fee awards, the contract language mandates that the fee award must be proportional. It is thus not just one factor among many that the Court may (or must) consider. Compare *Crystal Lake Limited Partnership*, 138 N.E.3d at 92, with *Land of Lincoln Goodwill*, 762 F.3d at 679. Likewise, unlike almost all federal statutes that deal with fee-shifting, which do not require proportionality, the Second Agreement *required* proportionality. Compare [90, ¶ 13], with *Catalan*, 2009 WL 2986122, at *2.

Unfortunately, the contract language—"reasonably proportionate to the ultimate relief"—does leave some room for interpretation. The parties could have selected an exact ratio. For example, they could have said 50%, 100%, 150% of the total monetary value of the relief obtained. Or they could have imposed a percentage cap: no more than 150% or 200% of the monetary value. Or an overall cap: no more than $100,000 or $200,000 or even $1 million. Any of these elaborations would have made this Court's task easier. Another complication is the absence of any citations in the parties' briefs to case law applying proportionality language in a contract.

Fortunately, there is case law parsing a similar limitation in the fee-shifting provision of the Prison Litigation Reform Act (PLRA). As is relevant here, the PLRA allows successful prisoner litigants to recover attorney's fees, but only if "the amount of the fee is proportionately related to the court ordered relief for the violation." 42 U.S.C. § 1997e(d)(2). Because the fee shifting clause at issue here is similar, the fee-shifting scheme for the PLRA is a useful touchstone.

A fee of 150% or less of any damages award is "proportionately related" for the purposes of the PLRA. *Pearson v. Welborn*, 471 F.3d 732, 742 (7th Cir. 2006). Thus, a prisoner plaintiff's attorney cannot recover more than 150% of any actual, punitive, and nominal damages.[5] The PLRA fee cap does not apply when a prisoner litigant is awarded non-monetary relief, such as an injunction. *Id*.

One might question the wisdom of importing a limitation on fee awards in prison litigation to regular civil litigation. But, on reflection, the Court finds it more principled to apply even a loosely analogous body of case law than simply plucking a number, or even a percentage, out of thin air. The analogy does not seem particularly ungenerous to the prevailing party, for the judgment in many prisoner civil rights cases vindicate important principles without yielding large damages awards—at least in part because jurors know that the state provides the necessities of life for prisoners. And the parties must have understood that any fees awarded under a contract provision spelled out at such a high level of generality could vary considerably depending on the metric chosen by the judge who awarded a victory to one side or the other. Perhaps this uncertainty is exactly what the parties intended and envisioned; if not, they should have chosen their words with greater precision.

Here, Plaintiff requests $210,476.25 in attorney fees. This is more than 150% of the damages at issue, which amounted to only $72,296.73. That is, using the PLRA multiplier, Plaintiff would only be entitled to a maximum of $108,445.10 in attorney's fees. Plaintiff argues, however, that the relief secured is broader than just the amount at stake in the Missouri Action, because the

---

[5] Defendant's proposal of awarding only 1/3 of the damages at issue is unconvincing. See [104 at 8–9 (discussing *Crystal Lake*, 138 N.E.3d at 84; *Anderson v. AB Painting and Sandblasting Inc.*, 578 F.3d 542, 546 (7th Cir. 2009))]. Defendant's only citations on this point involve trial courts that reduced attorney's fees awards as disproportionate, but were subsequently reversed on appeal. See *Crystal Lake*, 138 N.E.3d at 92 (not reaching whether trial court properly calculated proportionality, because it had failed to analyze any of the *Powers* factors); *Anderson*, 578 F.3d at 546–47 (reversing district court decision that lowered fee award from 700% to over 150%, because proportionality was not mentioned in fee-shifting statute).

Court afforded broader declaratory relief. The problem for Plaintiffs is that Illinois courts generally refuse to award attorney's fees for declaratory victories, even when faced with far more capacious fee shifting clauses. *Pennsylvania Truck Lines, Inc. v. Solar Equity Corp.*, 882 F.2d 221, 228 (7th Cir. 1989) (applying Illinois law) (citations omitted). The exception to this rule is only for declaratory judgment cases that are "integral to the enforcement of the contract." *Id.* (citing *Exchange Nat'l Bank v. Daniels*, 763 F.2d 286, 294 (7th Cir. 1985); *Carefree Foliage, Inc. v. American Tours, Inc.*, 505 N.E.2d 1039, 1043 (Ill. App. Ct. 1987)). In other words, when faced with similar fee-shifting provisions that discuss "enforcement," Illinois courts will distinguish between actions that seek to declare rights and those that attempt to enforce a contract, granting fees in the latter but not the former.

Here, the ultimate relief afforded as a result of the enforcement action is $72,296.73.[6] It is true that there may be ancillary benefits to Plaintiffs' victory, but these are not part of the present action, not before the Court, and are largely hypothetical at this point. Plaintiff may very well be able to use this Court's opinion(s) as a sword or a shield in future litigation, but that is not the kind of relief that Illinois courts hold to be reimbursable, especially given that this contract further limited the victor's right to fees with its proportionality clause. Given that Illinois courts would not award attorney fees for the mere declaration of rights under a contract, compare [105 at 4], with *Pennsylvania Truck Lines*, 882 F.2d at 228, the Court will not consider future hypotheticals as part of the "ultimate relief" secured in this action. In any event, in "strictly construing" the fee-

---

[6] Plaintiff argues for a more expensive definition of "ultimate relief" that acknowledges intermediate victories, such as moving venue from Missouri to this District and navigating discovery. But neither of these tasks were part of the "ultimate relief" that this Court granted, and therefore are irrelevant for the purposes of determining proportionality. Similarly, the fact that Defendant threw up roadblocks by moving to dismiss does not change the *relief* that the Court granted. Because this provision must be interpreted strictly, the Court cannot consider the costs of overcoming Defendant's obstinance when determining proportionality.

shifting provision, the Court will not consider secondary and tertiary emanations from its decision as part of the "relief" afforded. See *Powers*, 326 Ill. App. 3d at 515. Accordingly, the total request is disproportionate to the relief granted and is reduced to 150% of the amount at stake in the Missouri Action—$108,445.10.

### III. Conclusion

For the reasons set forth above, Plaintiff's motion for attorney's fees [95] is granted in part and denied in part. Plaintiff is awarded $108,445.10 in fees.

Dated: May 1, 2020

Robert M. Dow, Jr.
United States District Judge